### The INHABITANTS of BRUNSWICK
#### v.
### The INHABITANTS of LITCHFIELD.

Where the marriage of a female pauper was rendered valid by the operation of the *Resolve* of *March* 19, 1821, it was holden that her derivative settlement, thus gained, could not operate to oblige the town, thus newly charged with her support, to pay for supplies furnished prior to the passage of the Resolve.

*Assumpsit* to recover monies expended by the plaintiffs for the relief and support of *Mehitabel Potter* and her children, whose lawful settlement was alleged to be in *Litchfield.*

In a case stated by the parties, it was admitted that the paupers had no other settlement in *Litchfield* than was derived from *Robert Potter*, the supposed husband of said *Mehitabel* and father of her children, who, it was conceded by the defendants, was settled in *Litchfield.*

It also appeared that *Robert* and *Mehitabel* both resided in *Brunswick* in 1810, where their intentions of marriage were duly entered and published ;—that they were competent to contract marriage ;—that in *April* 1810, their marriage was solemnized by one *Adam Elliot*, the minister of an unincorporated church or society of *free-will-baptists* in that town, licensed and ordained according to the rules of that communion, and claiming and exercising the right to join persons in marriage ; of whose society the parties were then members.

And the question was, whether this marriage was valid, either by the general laws regulating marriages, or by force of a Resolve passed *March* 19, 1821, while this action was pending.

This Resolve, among other things, provides—" that all mar-" riages which have been solemnized within this State by min-" isters of the gospel, who were not stated and ordained minis-" ters of the gospel, between parties competent by law to con-" tract marriage, and whose intentions of marriage were legally

Brunswick *v.* Litchfield.

" published, shall be deemed and taken, and are hereby de-
" clared to be good and valid in law, to all intents and purpos-
" es ; and the children of parties thus joined in marriage, shall
" and are hereby declared to be entitled to all the privileges
" and immunities, to which children of parents who have been
" joined in marriage by stated and ordained ministers of the
" gospel, or Justices of the peace, are or may by law be en-
" titled :   *Provided however,* that this resolve shall not be deem-
" ed to extend to those, who, having been joined in marriage by
" any minister of the gospel not legally authorized, have since
" separated, and one of the parties has been legally joined in
" marriage with another person ; but the children of the first
" marriage shall be considered, to all intents and purposes, le-
" gitimate."

The argument was had at *November* term 1821, after which
the cause was continued to this term for advisement.

*Everett,* for the plaintiffs.

1. The marriage was valid by the laws in force at the time it
was solemnized.    Under the impression that marriage was a
divine institution, persons entering into that relation formerly
regarded the ecclesiastical character of the person officiating
at the solemnity, rather than his civil powers ;—and hence it
has been deemed sufficient if he was ordained after the usages
of his own sect.    The *Statute* 1786, *ch.* 3. does not require that
he should be *settled over* the town ; but it enables " every stated
" and ordained minister of the gospel *in* the town, district, par-
" ish or *plantation* where he *resides,*" to solemnize marriages.
The use of the term *plantation,* in which it is believed no cor-
porate parish existed at the time of the passage of the statute,
shews that the legislature did not look to the powers of the so-
ciety to which the minister might officiate, but to the clerical
character of the man himself.

2. But if not valid by the existing laws, yet it is rendered so
by the Resolve of *March* 19, 1821.    The case is clearly both
within the terms of the Resolve, and within the mischief it was
designed to remedy.    The number of such marriages was very
great, and rapidly increasing.    And it was in the power of a
vast number of men to abandon their wives and cast their

offspring on the world exposed to the evils of illegitimacy. For this alarming danger it was the duty of the legislature to provide a remedy, and such was the purpose of the resolve.

If the intent of the legislature, thus manifest and clear, cannot be carried into effect in the present case, it must be either 1st. because, on principles of natural and common right, retrospective laws cannot be obligatory;—or 2d. because they are unconstitutional.

As to the *first* objection. The law, deducible from various sources, is, that the legislature may, in doubtful cases, for equitable purposes, or to correct mistakes, pass remedial statutes, general and reciprocal in their import, but having, upon public corporations, a retrospective effect. 1 *Bl. Com. b.* 1. *ch.* 2. *Bac. Abr. Statute, E. Rex v. Northfield, Doug.* 661. There is high authority on this point in the amendment to the Constitution of the United States proposed by *Massachusetts* in 1793, which had a retrospective effect on suits then pending against a State. *Tucker's Blackst. Vol.* 1. *p.* 153. *note. Hollingsworth & al. v. Virginia,* 3 *Dall.* 378.

As to the *second* objection. The legislature is, in the first instance, the proper judge of its own powers. It is only in extreme cases that the Courts will refuse to execute its acts. *Adams v. Howe,* 14 *Mass.* 345. And the legislatures of this State and of *Massachusetts* have uniformly acted on the right to pass remedial laws however retrospective in their effect. *Statute* 1808, *ch.* 92. *Resolve, February* 12, 1819, &c. [Here the counsel cited a large number of acts and resolves of both States of the kind in question.] *Milford v. Worcester,* 7 *Mass.* 56. *Kendall v. Kingston,* 5 *Mass.* 534. *Blanchard v. Russel,* 13 *Mass.* 1.

The constitutional objection derives its force from the clause prohibiting the passage of *ex post facto* laws, and those impairing the obligation of contracts. But this Resolve is not *ex post facto,* but retrospective. *Calder & ux. v. Bull & ux.* 3 *Dall.* 386. 1 *Bl. Com.* 46, 91. And the latter branch of the objection was never held to apply to general laws remedial and confirmatory in their nature. *Lock, adm'r. v. Dame & al.* 9 *Mass.* 363. *Dartmouth College v. Woodward,* 9 *Cranch* 43. *Call v. Haggar,* 8 *Mass.* 430. *Walter v. Bacon, id.* 468. *Patterson v. Philbrook,* 9 *Mass.*

151. *Holbrook v. Finney*, 4 *Mass.* 566. *Bacon v. Callender*, 6 *Mass.* 309. *Foster & al. v. The Essex Bank*, 16 *Mass.* 270, 273.

Moreover it should be observed that the Resolve in question rather affects the *evidence* of the contract of marriage, than the contract itself; which was already a contract made between the parties, and binding *in foro conscientiæ*.

Orr, for the defendants.

A single reply is sufficient to the authorities cited for the plaintiffs. They do not apply to the case;—for in none of them is it found that the responsibility of one corporation was transferred to another.

The supplies were all furnished prior to the passage of the Resolve; at which time *Brunswick*, by the existing laws, was bound to pay for them;—and the defendants were not. The true question therefore is, whether the legislature have authority to change a legal obligation from one party to another, without the consent of the party thus charged?

1. As to the legality of the marriage by virtue of the laws then in force. It was necessary by *Statute* 1783, and such has been the construction, that the person officiating should be regularly ordained over some corporate parish in the town where he resided and where the marriage was solemnized. And similar to this is the law in *England*, where the cases of settlement derived by marriage will all be found to turn upon the authority of the person solemnizing. There he must be in·orders, and the marriage be had in strict compliance with all the forms of law. *Salk.* 119. *Rex v. Inhabitants of Luffington*, 1 *Wils.* 74. *Rex v. Inhabitants of Northfield*, *Doug.* 658. *Rex v. Inhabitants of Hodnett*, 1 *D. & E.* 96. And these cases shew that where the marriage is not legal, no settlement is derived from it.

2. The case is not within the provisions of the Resolve. It does not legalize marriages solemnized by persons not authorized by law. Nor is there, any necessity that this novel exercise of power should be enlarged by construction. It speaks of marriages which have been solemnized *within this State*, by which may be intended such as have occurred since the organization of the State as a separate sovereignty; and nothing more.

3. But if the Resolve by its terms should be understood to reach the case, yet it contravenes the provisions of the Consti-' tution, and is therefore void as to the present question. It impairs the obligation of contracts. The duty of one town to support its poor, has its corresponding right in other towns, who may advance them supplies, to remuneration. And this is founded in tacit contract, declared by law. The contract is with the State, as trustee of all parties beneficially concerned. The law is the same respecting the obligation to support schools, and to repair highways, &c. And these cannot be transferred. Here was an obligation imposed by existing laws on the inhabitants of *Brunswick*; and the ground taken by them is, that the legislature, by a single act of arbitrary power, have removed this obligation from them, and imposed it upon the defendants. Such a construction, it can hardly be supposed, the Court will be ready to admit.

MELLEN C. J. now delivered the opinion of the Court as follows.

According to the case of *Milford v. Worcester*, 7 *Mass.* 56. the supposed marriage in this case was void: and for the purpose of confirming *that* and many *other* supposed marriages solemnized under similar circumstances, the *Resolve* of *March* 19, 1821, was passed.—Without question, it was dictated by the best intentions and will be productive of very salutary consequences. Neither is it liable to the objection of unconstitutionality, as it respects all those legitimate objects of legislation which were in view and to which its application was contemplated.—But we cannot, without disrespect to the legislature, presume they intended thereby to destroy, impair or disturb vested rights, or *ipso facto* to create a debt from one man or corporation to another; because it is well known that this would transcend their constitutional powers. There is ample room for the operation of the Resolve in the most beneficial manner, without any interference with established principles, or in any degree invading private rights.—But to give to it the construction for which the plaintiffs' counsel has contended, would be to sanction an interference of one department of the government with another and expose the citizens to dangers

which neither they, nor the legislature ever contemplated.—Without going into any argument to shew that the Resolve would be directly unconstitutional, if it could receive such construction, we shall content ourselves with subjoining the following cases in support of the position. *King v. Dedham Bank*, 15 *Mass*. 447. *Medford v. Learned*, 16 *Mass*. 215. *Dash v. Van Kleeck*, 7 *Johns*. 477. *Calder v. Bull*, 3 *Dall*. 336. *Call v. Hagger*, 8 *Mass*. 422. Many others might be added.

It appears by the statement of facts that the expenses, the amount of which is demanded in this action, were incurred by *Brunswick before* the abovementioned Resolve was passed : and *until* it was passed, it is not pretended that the town of *Litchfield* was under any obligation whatever to pay the above sum to *Brunswick*. Now it is very clear that no act or resolve of the legislature can *of itself create* this debt on the part of *Litchfield* and subject them to instant liability to pay it to *Brunswick*.—Such a power as this would be destructive of those rights, which are guaranteed to the people by the Constitution.

There is no ground on which this action can be maintained, and the plaintiffs must be called.